## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                    )

**JOSEPH MAJID,**                   )
     **16657 Colonial Trail**        )
     **Lathrop, CA 95330**         )
                                      )
       Plaintiff,                )
                                      )
     v.                         )       **Case No. 1:16-cv-00731**
                                      )

**FEDERAL BUREAU OF INVESTIGATION**   )
     **935 Pennsylvania Ave NW**    )
     **Washington, DC 20535**     )
                                      )

**FBI AGENT JOHN DOE #1,**     )
     **c/o the Federal Bureau of Investigation**  )
     **935 Pennsylvania Ave NW**    )
     **Washington, DC 20535**     )
                                      )

**FBI AGENT JOHN DOE #2,**     )
     **c/o the Federal Bureau of Investigation**  )
     **935 Pennsylvania Ave NW**    )
     **Washington, DC 20535**     )
                                      )
       and                )
                                      )

**NIKKI WALLACE**          )
     **c/o DynCorp International**    )
     **1700 Old Meadow Road**    )
     **McLean, VA 22102**      )
                                      )
       Defendants.          )
_____)

## COMPLAINT
## FOR NEGLIGENT MISREPRESENTATION, NEGLIGENCE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INVASION OF PRIVACY, PRIVACY ACT VIOLATIONS, DEPRIVATION OF DUE PROCESS AND CONSTITUTIONAL RIGHTS, AND INJUNCTIVE RELIEF

COMES NOW the Plaintiff herein and complains of the Defendants as follows:

## PARTIES

1. Plaintiff Joseph Majid is an American citizen of Afghan descent. He is fluent or proficient in Dari, English, Pashto, Russian, and Turkmen. The allegations made herein concern illegal activities that the Plaintiff has endured after returning to the United States from Afghanistan, where he was employed by DynCorp International, Inc. (hereinafter "DI") as a translator.

2. Defendant Federal Bureau of Investigation ("FBI") is located in the District of Columbia, with a field office in California. From its headquarters in this jurisdiction, it ordered Defendant FBI agents John Doe #1 and #2 to engage in 24-hour surveillance of the Plaintiff upon his arrival in America from Afghanistan. FBI is the premier law-enforcement agency of the U.S. Government.

3. Defendant FBI agent John Doe #1 is an American citizen and full-time investigator for the FBI, and works out of their California office. He has engaged in 24-hour surveillance of the Plaintiff upon his arrival in America from Afghanistan.

4. Defendant FBI agent John Doe #2 is also an American citizen and full-time investigator for the FBI, and also works out of their California office. He similarly has engaged in 24-hour surveillance of the Plaintiff upon his arrival in America from Afghanistan.

5. Defendant Nikki Wallace, at all relevant times, was a coworker of the Plaintiff while he was working in Afghanistan as a translator. She resented the fact that he made an enormous amount of money compared to her salary, and made misrepresentations to her supervisor and other DI officials that he was a security risk and had ties to the Russian government.

## JURISDICTION

6. 28 U.S.C. § 1332 Diversity Jurisdiction is invoked with respect to all Defendants.

7.  28 U.S.C. § 1331 is invoked with respect to Defendant FBI in connection with Count V, Privacy Act U.S.C. § 522(a) Violation, and with respect to Defendants FBI and FBI Agents #1 and #2 in Count VI, Deprivation of Due Process Rights under Amendments V and XIV of the U.S. Constitution.

8.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." Thus this Court has supplemental jurisdiction over the Plaintiffs' state claims (i.e., Counts I-IV) alleged herein.

**VENUE**

9.  Venue is proper under 28 U.S.C. § 1391 because much of the activity, events, intentional acts, and omissions complained of herein on the part of the Defendants occurred in this judicial district. Specifically, the FBI headquarters is here in the District of Columbia, and it is from this judicial district that senior FBI officials authorized opening an investigative file on the Plaintiff and dispatching agents to Afghanistan to interrogate him. These senior officials also ordered two FBI agents from the FBI California field office to engage in 24-hour surveillance of the Plaintiff. The FBI records authorizing the opening of an investigative file and the other records pertaining to this surveillance activity are maintained in this jurisdiction. All of this activity was initiated as a result of Defendant Wallace's misrepresentations.

## STATEMENT OF FACTS

10. On or about June 2012, Plaintiff applied for and secured a security linguist position advertised with DI at a salary of $184,500 per year. He began working for DI in Afghanistan on July 1, 2012 and continued until March 9, 2014.

11. DI is a provider of various contracting services to the U.S. military, including security linguist services. In his position as a security linguist, Plaintiff was employed by DI, during July 2012 to March 2014 he provided his vital services to the U.S. military forces on Forward Operating Base ("Fob") Dwyer in Helmand Province, Afghanistan and Fob Lindsey in Kandahar, Afghanistan. Plaintiff had successfully obtained all necessary security clearances for this highly-respected and dangerous position.

12. From almost the moment he began working for DI, Plaintiff was treated as a second-class citizen. In January 2013, he began working with Defendant Nikki Wallace, one of Plaintiff's coworkers in Fob Lindsey. She was not of Afghan descent and did not have the same language skills that he possessed, and she was openly jealous of his higher salary. She had grown accustomed to discriminating between Americans of non-Afghan descent and the native Afghans who worked on the base at minimum-wage jobs.

13. Early on, she grouped Plaintiff into the latter category, despite his American citizenship and his deep commitment to the U.S. military effort in Afghanistan, for which he risked his health and safety on a daily basis. It was not an easy decision for Plaintiff to leave his family in the United States, but he did so because of a deeply-held conviction that he was assisting in a worthy cause by helping the U.S. troops' mission in Afghanistan.

14. Because she viewed the Plaintiff as a second-class citizen and resented the disparity in pay which existed between them, in May 2014, Defendant Wallace decided to do all in her power

4

to secure Plaintiff's dismissal from DI. It was her goal to put Plaintiff's career goals and livelihood in jeopardy. She did so by initially spreading rumors to the military clients with whom Plaintiff worked that Plaintiff was complaining to hotlines and DI investigators about their interrogation tactics. Plaintiff had never made such complaints. Defendant Wallace also spread the rumor that Plaintiff did not like the U.S. military, had complained about members of the U.S. Marine Corps and actually worked for the CIA, in an attempt to make the military clients suspicious of him. The rumor that he worked for the CIA was fueled by a paperwork error at Fob Dwyer which stated that it was the CIA, not the military, which had granted Plaintiff a security clearance. Military personnel and coworkers began asking him things like "why did you complain against the Marines?" or "Do you really work for the agency?"

15. Defendant Wallace went on to file a report with senior personnel at the military unit they were serving which stated that Plaintiff was a security risk. She went so far as to pass these defamatory reports on to other DI officials including Mitch LaGragory and Dejean Willie, the security coordinator in charge of Plaintiff's security clearance. These officials then contacted senior military personnel. As a result of these reports, Plaintiff was, of course, forced to resign immediately. He was able to find temporary employment with another security linguist contracting service, Mission Essential, who put him in the services of Navy Seal Team 8 in Logar Province. That team was tasked with the important responsibility of closing down a base, and he successfully assisted them in that mission until the base was closed and the team was safely returned to the main base in Logar. He received high commendations from the seal team lieutenant with whom he worked and the military linguist manager who oversaw his services.

16. However, news of the defamatory report had already reached Mission Essential by that time,

and upon return to Bagram, the Federal Bureau of Investigation (FBI) interrogated Plaintiff

in a harassing and intrusive manner, accusing him of having terrorist sympathies to try and

elicit a reaction from him. Mission Essential forced him to resign as well, and in November

2014 they gave him the option of taking the next plane home or being left to his own devices

in Afghanistan. Plaintiff chose to return to his home in California, fearful that the Taliban

would seek to punish him for being American and aiding and assisting the U.S. military.

17. The damage and humiliation did not end there, however. The FBI had heard rumors from DI

and/or Defendant Wallace that Plaintiff was a Russian operative, a CIA plant, a public safety

risk, and that he suffered from Post-Traumatic Stress Disorder (PTSD). Because of

Defendant Wallace's defamatory report, Plaintiff's security clearance had an "incident" on

his record, which effectively rendered his security clearance useless, and as a result he has

been unable to obtain comparable employment in which he could use his language skills.

Even worse, he cannot hold even low-wage jobs like taxi driving or trucking because of the

intrusive and harassing nature of FBI officials' monitoring of Plaintiff's activities. Despite

his diligent job search, Plaintiff has had to apply for unemployment assistance for the first

time in his life.

18. Defendants FBI agents John Doe #1 and John Doe #2 (the "FBI Agent Defendants") have

spoken to every single employer Plaintiff has had from July 2014 to present, and implied in

those conversations that the Plaintiff was a security risk, that was why they would need to be

monitoring his activities and his associates. The explicit and implicit message the FBI sent to

Plaintiff's employers was that he was a problem and that he had potential terrorist

connections.

19. The first job Plaintiff held when back in the United States was with a trucking company

called TWT Refrigerated Service, a trucking company, driving routes. He started in February 2015. While there, a rumor spread among his coworkers that "Joe Majid does not like white people" and that he was suffering from PTSD. One of his coworkers told Plaintiff that an FBI agent approached him and told him "here is my number, call me if you see [Plaintiff's] behavior change, because we feel he is unstable." The other drivers would joke with him, saying that if he did not behave, they would call their FBI contact. At the time, Plaintiff wanted to believe that they were making the story up, but he quickly realized that was not the case, and the harassment became so unbearable that he left for another job in May 2015.

20. In June 2015, Plaintiff found employment with the trucking company known as Home Delivery Logistics (HDL), out of Livermore, CA. The very first day on the job, while Plaintiff was in training under a coworker, the coworker began to harass him, seemingly to try and get some sort of reaction from him. Plaintiff immediately complained to his supervisor, and the harassment stopped. Later on, that same trainer/coworker admitted to the Plaintiff that he had been instructed by FBI agents to try and get a reaction from him, and that is why he had proceeded to harass him until the supervisor intervened. Plaintiff worked at this company for three months until HDL lost its contract and laid him off.

21. In August 2015, Plaintiff began working for the trucking company RJR Transportation, Inc. For the first several weeks, Plaintiff was given as many work hours as he wanted, and it was a good situation close to his residence. He had the hope that it would be a positive long-term employment. But after that initial period, his supervisors began giving him a hard time, telling him they did not have the work for him. His supervisors even stopped calling him. Despite repeatedly calling his supervisors and almost begging them for hours, telling them that he has a family to provide for, they would ignore or deny his requests. Finally he

addressed them directly, asking whether he should search for employment elsewhere. They told him "it looks like we can only give you one day a week, and as you know, who can make a living with one day a week?" Plaintiff therefore submitted his resignation and began looking for other employment in September 2015.

22. Plaintiff shortly found employment with Lazer Spot, another trucking company. Despite representations that it would be full-time employment, his supervisors only allowed him to work four days a week directing traffic in the truck yard, and this while his coworkers were working five to six days per week in order to meet the high demand for Amazon shipping during the holiday season. Without any provocation, and without even knowing him, Plaintiff's coworkers began harassing him, making comments to him such as "maybe you should go see a doctor, you have a problem." One of Plaintiff's coworkers, a Mr. John Garcia, actually confessed to Plaintiff that the FBI had approached him and told him that Plaintiff would only be working at Lazer Spot until he finished school and found a position as a linguist.

23. After that revelation, Plaintiff's supervisors indeed began pressuring him to find work as a linguist, sending him countless emails to that effect. While it is true that Plaintiff had sought out work as a linguist, he had been unable to find work in that field despite his considerable qualifications. Nevertheless, Plaintiff's supervisors cut down his work hours and sent people with cameras to film him during work. One such individual, a female coworker by the name of Jacki, inadvertently dropped the camera while she was filming him. Plaintiff confronted her regarding the camera, and she admitted that she had been filming him because she was "working for the police." He eventually submitted his resignation in January 2016 in order to escape this daily on-the-job harassment which seemed to never end.

24. Immediately thereafter, Plaintiff began working full-time as a driver for the online transportation network company, Uber Technologies, Inc. He had begun with Uber in August, 2015 on a weekend or after-hours basis, but did not ever think that he would be forced to rely solely on Uber for his livelihood. However, Plaintiff thought that an Uber driver position would provide him the autonomy and freedom from harassment that the FBI had instigated at his other work places. For the first several weeks of full-time work, he indeed was able to make ends meet and thought that he could put this dark chapter of his life behind him.

25. However, this quickly changed. Plaintiff began to mysteriously have problems receiving calls like the other drivers did on a normal basis. Despite being positioned at the busy San Francisco airport, he would go for hours without receiving a single call. When he did receive a call, the passenger had no luggage with him, and looked surprisingly like one of the agents who had photographed him at his other employment locations. Indeed, on approximately ten occasions, this same individual rode as a passenger in his car, and asked him the same questions during the drive: "why do Afghans hate Americans?" and "why do you hate white people?" He even asked "You are Afghan, and I know you. Do you live in Lathrop?" Finally, after several such incidents, Plaintiff called the passenger out as he was getting into the car. The agent promptly exited the car without any explanation. When Plaintiff complained to Uber, the dispatcher told him it was impossible for Uber to direct certain passengers to certain cars. But when Plaintiff provided the example of his treatment by suspected FBI agents, the dispatcher attempted to change the subject of the conversation. Strangely, after this point, Plaintiff had further difficulties with Uber, such as having the color of his car changed in the system so that passengers were confused when he arrived to pick them up, or

being "accidentally" blocked from receiving calls in the computer system. He has received

multiple assurances from Uber managers that his situation has been resolved, but as of the

date of this filing, he still is unable to receive a regular flow of calls as other Uber drivers do.

26. The FBI field operatives have also engaged in a campaign of covert and overt surveillance

and harassment by: (a) staking out Plaintiff's residence by waiting in a car for hours at a time

and then following close behind him when he drives off; (b) performing low-air flybys over

his residence in police helicopters; (c) canvassing his neighborhood and speaking with his

family and neighbors about him, telling them he has PTSD and is a security risk; (d) driving

past his house and striking the garage door with projectiles; and (e) photographing him in

public and private locations, with and without witnesses near, and without responding to

inquiries as to why they were photographing him.


### COUNT I: NEGLIGENT MISREPRESENTATION AGAINST DEFENDANT WALLACE

27. Plaintiff repeats and realleges paragraphs 1-26 as if fully cited herein.

28. Plaintiff worked for DI in Afghanistan for approximately two years. He served as a translator

and was constantly harassed by Defendant Wallace, because he was in her words, "making

too much money as a translator." When Plaintiff was in between translation assignments,

Defendant Wallace would state "you don't even do anything but get paid that much money!"

29. She falsely accused him of having ties to the Russian government, and spread the rumor that

the Plaintiff did not have any loyalty towards his American comrades and that he was

essentially a misfit with psychological issues.

30. Based upon information and belief, Defendant Wallace and other DI officials who knew of

his activities in Afghanistan, alerted the FBI to the fact that he was coming back to the U.S.

31. Based on information and belief, Defendant Wallace and these other DI officials eventually notified the FBI that the Plaintiff posed a security risk and had some psychological issues, and could not be trusted.

32. As a result of the false statements made by Wallace and other DI officials to the FBI that the Plaintiff posed a security risk, the California FBI office, at the direction of FBI headquarters, assigned local field agents to monitor Plaintiff's activities and interview Plaintiff's neighbors, coworkers, and even his friends at the local gym to determine what illicit activities the Plaintiff was involved in. To this day, FBI field agents are still tracking the daily activities and physical movements of the Plaintiff, including trailing him in government vehicles and privately-marked cars as he drove to his job.

33. Defendant Wallace and other DI officials owed a duty to the Plaintiff to convey correct information to the FBI regarding his loyalty to the U.S. and his mental wellbeing. Defendant Wallace and other DI officials knowingly conveyed false information to the FBI, which resulted in daily surveillance of the Plaintiff, severe emotional distress suffered by himself and his family, and a severely damaged reputation.

34. As a result of Defendant Wallace informing the FBI that he was a security risk, the FBI immediately started an unwarranted surveillance program and intrusion into Plaintiff's private affairs, and those of his family members. His extended family, which is quite large and well-connected in the Afghan diaspora community, has suffered great reputational damage from having Plaintiff's name being falsely connected with terrorism. As a result of her negligent misrepresentations made to the FBI, Plaintiff and family members have undergone intense emotional suffering and distress.

WHEREFORE, Plaintiff requests that judgment be entered in the sum of $250,000 against Defendant Wallace for the conduct alleged herein.

## COUNT II: NEGLIGENCE AGAINST DEFENDANT FBI AGENTS

35. Plaintiff repeats and realleges paragraphs 1-34 as if fully cited herein.

36. As already noted herein, as a result of the false statements made by Wallace and other DI officials to the FBI that the Plaintiff posed a security risk, the California FBI office, at the direction of FBI headquarters, assigned local field agents to monitor Plaintiff's activities and interview Plaintiff's neighbors and coworkers to determine what illicit activities the Plaintiff was involved in. To this day, FBI field agents are still tracking the daily activities and physical movements of the Plaintiff, including trailing him in their government vehicles.

37. At all relevant times herein, the FBI agents did not have a valid basis for believing Plaintiff to be a security risk. They did not investigate, or were negligent in their investigation of, the bona fides of Defendant Wallace's and other DI officials' accusations of Plaintiff in that they took them at face value.

38. Due to the confluence of the FBI's failure to investigate the validity of these claims, combined with the overzealous and harassing nature of the Defendant FBI agents' surveillance of the Plaintiff, he has been injured psychologically, financially, and in his reputation.

WHEREFORE Plaintiff requests that this Court issue a restraining order preventing the Defendant FBI agents from continuing their surveillance of him and family members and intimidating his neighbors and portraying him as a security risk and someone they should fear.

Plaintiff further requests damages in the amount of not less than $250,000 for the psychological and emotional trauma he has suffered. He also requests judgment be entered for the sum of not less than $1,000,000 in lost wages and other damages as follows: (a) approximately $20,000 in moving costs and $600 per month in increased mortgage payments for the next 30 years because he moved houses after having his garage door shot through by FBI agents; (b) at least $11,633.00 per month in lost salary (i.e., $15,333.00 per month at a yearly salary of $184,000 as a linguist versus the $700 to $900 per week he is able to make as a driver with Uber); (c) projected future damages as a result of his inability to hold a position as a linguist in his chosen profession due to the "incident" on his security clearance and the persistent meddling of FBI agents in his attempts at securing alternative employment; and (d) approximately $2,000  in expenses incurred in attempting to secure the premises of his home with an alarm system and surveillance cameras.

## COUNT III: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT FBI AGENTS

39. Plaintiff repeats and realleges paragraphs 1-38 as if fully stated herein.

40. As a result of the aforementioned harassment, Plaintiff has been psychologically wounded and traumatized. He feels constantly threatened and afraid for his life. He has not been able to access the treatment and medication such psychological harm require because he cannot hold a job which would either provide medical insurance or provide adequate compensation for him to afford such treatment. His sleep is irregular at best. Because he fears for his safety and that of his family, he sold his previous home. When his wife is home alone, she arms the house alarm, and even then is terrified until he returns home.

WHEREFORE Plaintiff requests that this Court issue a restraining order preventing the Defendant FBI agents from continuing their surveillance of him. Plaintiff further requests

damages in the amount of not less than $250,000 for the psychological and emotional trauma he
has suffered.

**COUNT IV: INVASION OF PRIVACY AGAINST DEFENDANT FBI AGENTS**

41. Plaintiff repeats and realleges paragraphs 1-40 as if fully stated herein.

42. Plaintiff has detailed in paragraph 14 how the FBI is monitoring his daily activities and
engaging in a pattern of harassment designed to inflict emotional distress on the Plaintiff and
his family.

43. One of their tactics is to spread rumors and promote publicity designed to put the Plaintiff in
a false light to coworkers, the general public, and his neighbors.

44. These FBI agents, for example, have spoken with not less than ten of Plaintiff's neighbors,
and in doing so the agents let it be known in Plaintiff's neighborhood that he is violent, a
national security risk and he is also a mental case. Although certain neighbors have shared
these interactions with Plaintiff, in general this canvassing has resulted in the neighbors not
having any daily interaction with Plaintiff, fearing that the FBI would deem them to be
security risks as well. As a result of this unfair publicity, Plaintiff has found it necessary to
switch jobs on a number of occasions. He feared that once the FBI learned where he was
working by tracking him from his house, they would start the rumor mill about him being a
national security risk, hoping to cause his termination. Based upon this activity, which is still
occurring today, FBI agents John Doe I and John Doe II have repeatedly invaded the privacy
of Plaintiff.

45. Plaintiff is under near-constant surveillance by FBI and other law-enforcement officials.
They drive by his house frequently, park outside of it, and sometimes knock on his door to

"ask him a few questions." Plaintiff responds by telling them "no problem, let me get ahold of my attorney," at which point they leave.  On other occasions, individuals posing as contractors working for Comcast requested permission to enter his home in order to install a cable system. One requested access to the cable jack, and Plaintiff indicated its location inside the living room, but he said he wanted to look for a jack on the roof. He proceeded to climb onto Plaintiff's roof, and after several minutes returned to report he could not find a jack there. Plaintiff then indicated the jack in the living room, saying "it's here, like I told you the first time."

WHEREFORE Plaintiff seeks a monetary award of $600,000 for such conduct and the emotional distress he has suffered and continues to suffer.


**COUNT V: PRIVACY ACT VIOLATION 5 U.S.C. § 522(a) AGAINST DEFENDANT FBI**

46. Plaintiff repeats and realleges paragraphs 1-45 as if fully recited herein, and specifically paragraph 14 wherein he details the surveillance that he has been subjected to by FBI field agents and other intrusions into his private affairs, e.g., knocking on doors of neighbors and disseminating false information as to the fact that Plaintiff is a security risk.

47. The Privacy Act safeguards the public from "unwarranted collection, maintenance, use, and dissemination of personal information contained in agency records." See *Cloonan v. Holder*, 768 F. Supp 2d 154, 161 (D.D.C. 2011). An individual who is concerned that agency records are accurate has the right to participate in some sort of agency review action to ensure that his records are properly used. Id.

48. To make sure that this goal is accomplished, the act requires agencies to comply with detailed instructions for managing their records, and it also provides various sorts of civil

relief to individuals aggravated by failures on the government's part to comply with said requirements. *Henke v. Dept. of Commerce*, 83 Fed 3rd 1453 1456 DC Cir. 1996.

49. Section E(7) of the Privacy Act specifically provides that a government agency like the FBI has an obligation "to maintain no record describing how an individual exercises his rights guaranteed by the first amendment unless within the scope of an authorized law-enforcement activity." Plaintiff is unaware of any unusual activity which the FBI deems to warrant law-enforcement activity.

50. As recited in Count I, Plaintiff believes that various officials from DI, including Defendant Wallace, reported false and defamatory accounts of Plaintiff's activities in Afghanistan and his current mental health status. As a result, Plaintiff believes that the present record that the FBI maintains has damaging and false information. Unfortunately, the agents that are engaging in surveillance of Plaintiff have been: (a) disseminating that false information in the neighborhood where he lives; and (b) acting outside the scope of any authorized law-enforcement activity.

WHEREFORE Plaintiff requests that an order be entered herein allowing his attorneys to review whatever files the FBI currently maintains on his activities, and that any and all false and defamatory material contained therein be deleted, consistent with the protections afforded the Plaintiff by the Privacy Act.

### COUNT VI: DEPRIVATION OF DUE PROCESS PROCEDURAL RIGHTS GUARANTEED BY THE U.S. CONSTITUTION AGAINST DEFENDANTS FBI AND FBI AGENTS #1 AND #2

51. Plaintiff repeats and realleges paragraphs 1-50 as if fully recited herein.

52. As already described herein, various liberty interests which are guaranteed to the Plaintiff under the U.S. Constitution and the due process clauses under the 5th and 14th amendments have been violated by the FBI agents named herein.

53. These agents received incorrect information from one or more individuals associated with DI. Those individuals slandered the plaintiff by informing FBI agents in the FBI California office that the Plaintiff was a security risk to America. Nothing could be further from the truth.

54. Procedural due process imposes constraints on government decisions like the one made by the FBI to immediately start monitoring Plaintiff's activities as a result of a single telephone call from a DI official. That decision had an irreparable effect on the Plaintiff because his right to privacy was immediately invaded without him being afforded any procedural due process. For example, the Plaintiff had a right to life, liberty and the pursuit of happiness and not to have his privacy invaded by the FBI officials named herein twenty four hours a day.

55. The fundamental requirement of due process is an individual's opportunity to be heard in a timely fashion and in meaningful manner. When the FBI received slanderous information from individuals concerning the Plaintiff, they had an obligation to call him in and have him explain what happened in Afghanistan. Plaintiff should have been given a meaningful opportunity to explain why he did not, and never has, posed a security risk to the U.S. government.

56. As this Court knows, due process is not a technical concept with a fixed content unrelated to times and circumstances. Due process is a flexible concept and calls for such procedural protections as the particular situation demands.

57. Plaintiff was deprived of his constitutional interest to be free from invasion of his privacy without any procedural safeguards being first employed by the FBI agents. For example, by receiving information from individuals associated with DI and immediately initiating an investigation of the Plaintiff which included twenty-four hour surveillance, it did not afford the Plaintiff a meaningful opportunity to explain why DI officials would be trying to damage his reputation and make a slanderous statement that he posed a danger to America. Thus, the Defendant FBI agents named herein have violated the Plaintiff's constitutional interest in being able to pursue life, liberty, and happiness in terms of daily family life free from government surveillance and being able to hold permanent employment without interference from FBI agents.

WHEREFORE, the Plaintiff hereby requests entry of a judgment of $250,000 against the FBI officials named herein for violating his right to privacy by engaging in a twenty-four hour surveillance program of Plaintiff's activities, which included intrusive visits to Plaintiff's neighbors. They violated his constitutional liberty interest because they never afforded him a meaningful opportunity to rebut any charge made by any DI officials concerning his loyalty to the United States. Had they made a reasonable investigation of these charges, they would have found that they were baseless and trumped up in an effort to retaliate against the Plaintiff for his success as a security linguist.

## COUNT VII: VIOLATION OF CONSTITUTIONAL RIGHTS BY FBI AGENTS #1 AND #2 IN UNDER *BIVENS V. SIX UNKNOWN AGENTS*, 403 U.S. 388 (1971)

58. Plaintiff repeats and realleges paragraphs 1-57 as if fully recited herein.

59. Plaintiff brings this action under *Bivens v. Six Unknown Agents*, 403 U.S. 388 (1971) and its progeny, which establish a cause of action against federal officials in their individual

capacities for a violation of a person's constitutional rights. To state a claim under *Bivens*, a plaintiff must allege that he: (1) was deprived of a constitutional right; (2) by a federal agent; (3) acting under color of federal authority. *See Ali v. Cassanta*, 2007 U.S. Dist. LEXIS 37298 (D. Conn. May 21, 2007). A *Bivens* claim will lie when there is no alternative remedy under state or federal law. *Minneci v. Pollard*, 132 S.Ct. 617 (2012).

60. As mentioned previously, Plaintiff has the constitutional rights to: (a) life, liberty, and the pursuit of happiness in terms of living his daily family life free from government surveillance and being able to hold permanent employment without interference from federal officials; (b) travel free from unreasonable burdens within the United States; (c) to be free from being falsely stigmatized as an individual associated with terrorist activity and from having these associational falsehoods disseminated widely to Plaintiff's employers, coworkers, next-door neighbors, friends, and family.

61. Plaintiff was deprived of the aforementioned rights by the campaign of harassment and surveillance, described already herein, in which Defendants FBI agents #1 and #2 staked out Plaintiff's residence, followed him when driving, performed low-air flybys over his residence in police helicopters, spoke door-to-door with his neighbors and his employers about him, telling them he has PTSD and is a security risk, drove past his house and struck his garage door with projectiles, and photographed him in public and private locations, with and without witnesses near.

62. Because of this campaign, he has not been able to pursue employment or enjoy his family life. He has been bounced from job to job, unable to receive the driving hours or other assignments necessary to earn money. His wife and children live in fear, and they have had to move houses. He cannot travel without the fear or actual occurrence of being followed by

FBI vehicles, his employers and coworkers believe he is associated with terrorist activity or otherwise a security risk, and his neighbors are fearful of speaking with him.

63. Defendants FBI agents #1 and #2 are responsible for this deprivation because they have personally engaged in the above activities. They have personally knocked Plaintiff's neighbors' doors, personally spoken with Plaintiff's employers, and personally engaged in the above surveillance activities.

64. At all relevant times herein, the FBI agents were acting under the color of federal authority. They represented to Plaintiff, his neighbors, friends, family, coworkers, and employers that they were duly-authorized FBI agents who were working under the aegis of the U.S. government.

WHEREFORE, the Plaintiff hereby requests entry of a judgment of $600,000 individually against the FBI officials named herein for violating his constitutional rights.

### COUNT VIII: VIOLATION OF CALIFORNIA CIVIL CODE § 51.7, 52.1 BY DEFENDANTS FBI, FBI AGENTS #1 AND #2, AND WALLACE

65. Plaintiff repeats and realleges paragraphs 1-64 as if fully recited herein.

66. Plaintiff alleges that he was subjected to intimidation by threat of violence because of his race, color, ancestry, national origin, primary language, and perceived political affiliation in violation of Civil Code § 51.7. Plaintiff further alleges that Defendants named herein intentionally interfered, or attempted to interfere, through threats, intimidation or coercion with the enjoyment of Plaintiffs individual rights, including the right to privacy in violation of Civil Code § 52.1.

67. Section 52.1 of the Civil Code guarantees the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights

secured by the Constitution or laws of this state without regard to his or her membership in a

protected class identified by its race, color, religion, or sex, among other things.

68. To establish a claim under Section 52.1, a plaintiff must prove that defendant interfered by

threats, intimidation, and/or coercion, or attempts to interfere by threats, intimidation, and/or

coercion, with the exercise or enjoyment of the rights secured by the Constitution or laws of

this state. This is accomplished by a showing of: (1) that Defendant interfered with or

attempted to interfere with Plaintiff's rights by threatening or committing violent acts; and

(2) Plaintiff reasonably believed that if he exercised his right to privacy or other

constitutionally-protected right that defendant would commit violence against him or his

property.

69. Civil Code section 52.1 "require an attempted or completed act of interference with a legal

right, accompanied by a form of coercion." Jones v. Kmart (1998) 17 Cal.4th 329, 334; City

and County of San Francisco v. Ballard (2006) 136 Cal.App.4th 381, 408. However, nothing

in Civil Code section 52.1 requires any showing of actual intent to discriminate. Venegas v.

County of Los Angeles (2004) 32 Cal. 4th 820, 841. "In pursuing relief for those

constitutional violations under section 52.1, plaintiffs need not allege that defendants acted

with discriminatory animus or intent, so long as those acts were accompanied by the requisite

threats, intimidation, or coercion." Venegas (2004) Id. at 820.

70. In this case, Defendant Wallace interfered with Plaintiff's individual rights under the

California Constitution Article 1, Section 8: the right to pursue his employment. This was

done by spreading the rumor that Plaintiff had complained about military personnel and by

filing a report with the senior military unit where they were stationed stating that Plaintiff

was a security risk.

71. Further, Defendant FBI agents interfered with Plaintiff's individual rights under the California Constitution, California Constitution Article 1, Section 1 and 7:  pursuing and obtaining safety, happiness, and privacy. This was done by engaging in the campaign of surveillance and harassment as more fully set out above.

WHEREFORE, the Plaintiff hereby requests entry of a judgment of $600,000 individually against the FBI officials named herein for violating his constitutional rights.


## JURY DEMAND

Plaintiff demands a trial by jury as to all claims so triable.


Respectfully Submitted,

*/s/ Martin F. McMahon*

Martin F. McMahon, Esq.
D.C. Bar Number: 196642
Martin F. McMahon & Associates
1150 Connecticut Avenue, N.W., Suite 900
Washington, D.C. 20036
(202) 862 - 4343
mm@martinmcmahonlaw.com
*Counsel for Plaintiff*